# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

02 JUL 31  PM 3: 14

U.S. DISTRICT COURT
N.D. OF ALABAMA

|  |  |  |
|---|---|---|
| VETRA ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 00-JEO-2251-S |
| | ) | |
| CITY OF BIRMINGHAM; THE BIRMINGHAM | ) | |
| POLICE DEPARTMENT; CHIEF MIKE | ) | |
| COPPAGE; OFFICER IRENE WILLIAMS, in | ) | |
| her individual and official capacity; OFFICER | ) | |
| SANDERS, in his individual and official capacity; | ) | |
| CAPTAIN FISHER, in his individual and official | ) | |
| capacity; SERGEANT WEBB, in his individual | ) | |
| and official capacity; OFFICER BRANDON | ) | |
| JACKSON, in his individual and official capacity; | ) | |
| and, OFFICER LONNIE GRAHAM, in his | ) | |
| individual and official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

ENTERED

JUL 31 2002

## MEMORANDUM OPINION

Pending before this court is the motion for summary judgment filed by various

defendants, the City of Birmingham, the Birmingham Police Department, Chief W. Michael

Coppage ("Coppage"), Officer Irene Williams ("Williams"), and Officer L. Graham ("Graham")

(doc. 21); the motion of defendant Brandon Jackson ("Jackson") for summary judgment (doc.

24); and, the plaintiff's motion for leave to amend her complaint (doc. 17).  Upon consideration

of the motions, the arguments, the record, and the law, the court finds that the motion for

summary judgment of defendants City of Birmingham, the Birmingham Police Department,

Coppage, Williams, and Graham is due to be granted; the motion for summary judgment of

Jackson is due to be granted in part and denied in part; and the motion for leave to amend is due

to be denied.

*30*

## I. FACTS[1]

During the early morning hours of August 9, 1998, defendant Jackson, then a police officer with the Birmingham Police Department, responded to a domestic disturbance call at the home of Vetra Adams ("the plaintiff" or "Adams") because her husband, James Bell ("Bell"), was upset that she had pawned their television and VCR. (Adams Depo. at 52).[2] Jackson initially talked jointly with Adams and her husband and then separated them in order to take individual statements. (*Id.* at 53). He took Bell's statement first and then took Adams's statement while they were sitting in his patrol car. Bell remained in the house and vicinity while Jackson and Adams were in the car. The plaintiff's two children were in the house at that time as well. (*Id.* at 55). According to Adams, Jackson threatened to have her children taken away during their conversation. (*Id.* at 58). While Jackson and Adams were in the car, Bell left the house in the family truck to go to the store. (*Id.* at 57).

Adams returned to the house and Jackson followed her inside. (Adams Tr. I at 4).[3] Adams then told Jackson she needed to take a shower. (*Id.*). She told him to leave a card and presumed he was going to leave. (*Id.* at 8). Jackson then followed her into the bathroom, while Adams was showering, and began talking with her. (*Id.* at 4-5). Jackson followed her around the house before they both went into the bedroom and began having sexual relations. (*Id.* at 4-6, 10). She did this because she was fearful that he would report her domestic situation to the

---

[1] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[2] The plaintiff's deposition is found at document 27, exhibit 2.

[3] This transcript is found at document 27, exhibit 3 and is dated August 19, 1998 at 4:26 a.m.

Department of Human Resources ("DHR").  (*Id*. at 21-22).

Bell returned home to find Adams and Jackson having sexual relations.  (Adams Depo. at 59).  Jackson tried to explain the matter to Bell while Bell attempted to call another police officer.  (Adams Tr. I at 12-13).  Bell first attempted to call the police from his home phone, but was prevented from doing so by Adams when she pulled the phone connection out of the wall.  (*Id*. at 12).  Bell went outside to the neighbors to have them call 911.  (*Id*. at 13-14).  Jackson then threatened Adams, telling her "Don't you say a damn word, don't you say a God damn word, you know.  Just shut up and don't say nothing (sic)?," while he was putting on his gun belt, which had been left in the living room.  (Adams Depo. at 62).

Officer Steven Sanders ("Sanders") arrived at the residence in response to the neighbor's call and observed Bell and Jackson standing outside the residence talking.  Jackson and Sanders initially talked in Sanders' patrol car and then Jackson left the area.  (Adams Depo. at 61-62, 65).  Jackson admitted to Sanders that Bell caught him (Jackson) having sexual relations with Adams.  (Sanders Tr. at 1).[4]  Sanders next talked with Bell and then with Adams.  (Adams Depo. at 67).  During the conversation with Adams, she (Adams) states that Sanders asked her if she wanted the DHR involved in this matter.  (Adams Tr. I at 19).  She did not provide Sanders with any details of the incident other than to tell him what Jackson had done to her.  (Adams Depo. at 68-70).  Sanders told her that she did not have any proof.  (*Id*. at 70).  During the conversation, Sanders offered Adams and her husband an automobile premised on their financial difficulties.  (Adams Tr. I at 24-25).  He also provided them with his home telephone number.  (*Id*.).  Sanders further advised Adams that she should use a hand held recorder in case a future, similar incident

---

[4] Sanders's interview is found at document 27, exhibit 5.

3

occurred. (Adams Depo. at 49). Sanders did not call a supervisor to the scene because Bell did

not want one there. (Sanders Tr. at 10).

Sanders returned to the West Precinct a short time later, around the end of the shift, where

he reported to Sergeant William Brewer that "Mr. Bell informed him that he caught Officer

Jackson in bed with his wife, Ms. Vetra Adams." (Inter-office Communication ("IOC") at 1).[5]

By the time Brewer learned of the incident, Jackson had completed his shift and left the precinct.

(*Id.*). Brewer telephoned Adams's residence at some time during the day, but no one answered

the telephone. He also determined at some unspecified time during the day that no incident

report was filed concerning the initial complaint, which should have been completed by Jackson.

(*Id.*).

On August 9, 1998, at 11:30 p.m., Sanders's next shift, Brewer met with Sanders to

further discuss the incident. He detailed his conversation in an inter-office correspondence to

Coppage. It provides:

> At 2330 hours this evening, I called Officer Sanders aside to obtain a taped
> statement prior to continuing the investigation. Officer Sanders came forward
> with more in-depth information of the incident, which changed the entire scope of
> the investigation. Officer Sanders stated that after he arrived at Mr. Bell's
> residence, he spoke to Officer Jackson inside of his police vehicle. He said that
> Officer Jackson admitted to having intercourse with Ms. Adams, and being caught
> in the act by Mr. Bell. At this point, Officer Sanders told Officer Jackson to leave
> the scene so that the situation would not escalate. He said that Mr. Bell refused to
> speak with a supervisor and did not want to file a police report, but wanted him to
> speak with his wife about the situation. Officer Sanders went inside the residence,
> and spoke with Ms. Adams. She told him that Mr. Bell had called Officer
> Jackson to their residence, because she had pawned a television belonging to Mr.
> Bell. After Officer Jackson had obtained Mr. Bell's information for the report,
> Mr. Bell left the scene. Officer Jackson reportedly then spoke to Ms. Adams
> about the incident. Ms. Adams said that during the interview, Officers (sic)

---

[5] This memorandum is found at document 27, exhibit 7.

Jackson made several suggestive sexual remarks toward her, and then told her that she could go to jail over the incident. Officer Sanders said Ms. Adams stated that Officer Jackson used the possibility of criminal charges as a means of coercing her into having sex with him. Ms. Adams said she took a shower and that she and Officer Jackson engaged in oral sex. After this, they reportedly engaged in intercourse prior to Mr. Bell returning home. Ms. Adams told Officer Sanders that she enjoyed the sexual encounter, but had been intimated and coerced into the act. Officer Sanders said that Mr. Bell informed him that when he returned to the residence, he observed Officer Jackson's gun belt lying on the sofa. He said he found Officer Jackson in the bedroom attempting to pull up his pants, and his wife lying naked on the bed.

(IOC at 2). After the conversation, he contacted a supervisor, Captain Curry who instructed him to contact Internal Affairs. She discussed the situation with Williams, the officer on call, who instructed him to have Sanders report to her office at 8:00 a.m. that day (August 10, 1998).

Jackson called Adams at home late that night (August 9, 1998, or early August 10, 1998). She recorded the conversation. She got in contact with Sanders and informed him of the conversation. She played the tape over the phone. (Adams Depo. at 78-79).[6] Jackson stated during the conversation that if she was asked about the incident, she was to say nothing happened. (Sanders Tr. at 8). Sanders notified Brewer about the conversation at approximately 2:15 a.m. on August 10, 1998. (IOC at 2). Sanders told Brewer that "Jackson had just called her residence, and spoke to her about the incident. She said that she was afraid for her safety, and had tape-recorded the lengthy conversation." (*Id.*). Brewer called Williams to inform her of the development. (*Id.*). She decided to begin her investigation immediately. (Williams Depo. at 86).[7]

Williams went to the precinct at about 3:05 a.m. on August 10, 1998. (Sanders Tr. at 1).

---

[6] At another point in the deposition, Adams states that Sanders called her; however, that is not consequential in the present analysis. (Adams Depo. at 76).

[7] Williams' deposition is found at document 27, exhibit 6.

She interviewed Sanders. He stated to her that upon arriving at the scene, Jackson informed him that Bell had caught him having sexual relations with Adams. (*Id*.). After the interview was completed, Williams called Adams at home. (Williams Depo. at 86). Williams went to Adams's residence to talk with her because she could not leave her children alone at home. (*Id*.).

Adams was interviewed by Williams at approximately 4:26 a.m. (Adams Depo. at 70-72). Williams asked Adams for the tape recording of the conversation with Jackson. Williams informed Adams that unless she turned over the tape, she could not conduct an investigation on Jackson's behavior. Adams provided Williams with the tape. (*Id*. at 80-81). During an hour long interview, Adams told Williams about the events involving Jackson, including her concerns for her children and that she felt intimidated. (Adams Tr. at 10-11, 22).

Following the Adams interview, Jackson was taken "out of service." (Williams Depo. at 87). His badge and weapon were also taken. (*Id*.). He was placed on Administrative Leave due to the investigation. (Doc. 23, Ex. 9).

Bell was interviewed by Williams at about 12:45 p.m. on August 10, 1998. (Williams Tr. at 1). He confirmed the information provided by Adams and stated that Jackson had him sign a report regarding the initial encounter involving he and Adams. (*Id*. at 5).

Adams went to the precinct at approximately 2:05 p.m. on August 10, 1998, to file a written complaint. (Doc. 23, Ex. 8). Adams was interviewed a second time by Williams and Sgt. Webb at the Birmingham Police Department. (Adams Depo. at 81; Adams Tr. II).[8] Adams reiterated that she felt coerced by Jackson. (Adams Tr. II at 9, 11). She also stated that he forced himself on her. (*Id*. at 13).

_____

[8] The transcript of this second interview is found at document 27, exhibit 8.

6

Jackson was interviewed on August 10, 1998, at 4:00 p.m. (Jackson Tr. at 1).[9]  Initially,

he denied any wrong doing.  (*Id.* at 12).  When he was confronted with his telephone

conversation with Adams, he acknowledged having sexual relations with her.  (*Id.* at 14).  He

asserted that the relations were consensual.  (*Id.* at 18).

A September 14, 1998 inter-office communication states that Jackson resigned.  (Doc. 23,

Ex. 10).  About one month later, on October 13, 1998, Coppage informed Adams, via a letter,

that based on his recommendation, Officer Jackson had resigned from the police force.  (Doc. 23,

Ex. 11; Adams Depo. at 82).

Adams contacted the Birmingham Police Department about February 1999 regarding her

complaint that Jackson committed a sexual assault on her.  Detective Mary Murphy was assigned

to the case to make further inquiry into the allegations of criminal wrongdoing.  (Doc. 27, Ex.

10).  She (Murphy) conducted an investigation into Adams's allegations and presented the

evidence to an Assistant District Attorney, who declined further action based on Adams's

inconsistent statements made in August 1998 during the interviews.  (*Id.*).  On March 2, 1999,

Adams was notified that no criminal charges would be sought against Jackson by the District

Attorney.  (Doc. 27, Ex. 12).

Although no evidence is offered in opposition to the motion for summary judgment

regarding the plaintiff's subsequent arrest, the opinion of the Alabama Court of Criminal Appeals

reflects the following:

> The evidence presented at trial showed the following:  In the early
> morning hours of November 14, 1998, Adams was pulled over by Officer Lonnie
> Graham because her tag light was not working.  Officer Graham took Adams's

---

[9] The transcript of this interview is found at document 27, exhibit 1.

7

> driver's license information and placed her in the back of his patrol car because,
> he testified, he believed her to be a flight risk.  After discovering that Adams's
> driver's license had been suspended, Officer Graham removed Adams from the
> patrol car and had her stand on the sidewalk while he removed the backseat of his
> patrol car and conducted a search.  Officer Graham testified that he found a small,
> clear bag containing several other smaller bags, which contained crack cocaine.
> Officer Graham handcuffed Adams and placed her back in his patrol car.  While
> inventorying Adams's vehicle, Officer Graham discovered a crack pipe.

(Doc. 17, Plaintiff's Ex. 1 at 2).  During the arrest, Graham "made some comment to the effect

of, 'I am not worried about you so much as I am worried about my brother Brandon

[(Jackson)].'"  (*Id.* at 4).  When the plaintiff further inquired about his comment, Graham stated,

"'We are all brothers in this game.'"  (*Id.*).  The court's opinion further states that "Adams

sought [at trial] to introduce evidence that she was set up and targeted by the police" because of

her complaint against Jackson.  (*Id.*).  Her conviction on the drug charges was reversed and

remanded for a new trial because the trial court did not allow all of the testimony concerning this

matter.

## II. PROCEDURAL HISTORY

The plaintiff filed her complaint in this action on Friday, August 11, 2000.  The first

count alleges in general terms that the defendants violated her constitutional rights under § 1983.

*See* 42 U.S.C. § 1983.  The second count alleges that the defendants conspired to violate her

rights under § 1985.  *See* 42 U.S.C. § 1985.  The third count alleges that the defendants failed to

act to prevent the wrongs alleged in Count II.  *See* 42 U.S.C. § 1986.[10]  The fourth count alleges

---

[10] Section 1986 provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned
> in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the
> commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the
> party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by
> reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and
> any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action;

that the policies and procedures of the City of Birmingham were the cause of the injuries to the plaintiff. (Doc. 1, ¶ 27). The fifth count alleges that the individual defendant officers committed a battery on the plaintiff. The sixth count alleges that the individual defendant officers subjected the plaintiff to malicious prosecution. The seventh count alleges that the individual defendant officers misused the legal process for "ulterior or improper" reasons, resulting in "severe emotional and physical harm" to the plaintiff. The eighth count[11] alleges negligence on the part of the defendant officers. The last count alleges that the defendant officers attempted to punish her by filing criminal charges against her for exercising her First Amendment rights.[12]

On August 22, 2000, the plaintiff moved to dismiss the malicious prosecution claim (Count VI) due to the fact that she had been convicted on the drug charges in circuit court. (Doc. 2). The motion was granted. (Doc. 5). As just noted, the plaintiff's conviction was reversed and the case was remanded to the lower court for a new trial on June 29, 2001. She filed a motion to amend her complaint to reinstate the malicious prosecution claim and to add an abuse of process claim. (Doc. 17). She also seeks to add Officer Sanders and Captain Fisher as defendants premised on the deposition of Williams. (*Id.* at ¶ 5). The defendants object to the motion to amend. (Doc. 19).

The defendants filed their motions for summary judgment on August 29 and 31, 2001.

---

and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding five thousand dollars damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

42 U.S.C. § 1986

[11] This count is incorrectly identified as Count IX in the complaint.

[12] This count is misnumbered as Count X in the complaint.

9

(Doc. 21 & 24).  The issues have been fully briefed by the parties.

## III. DISCUSSION

### A. Motion to Amend

#### 1. Standard of review

A complaint may be amended with leave of court after a defendant has filed a response. FED. R. CIV. P. 15(a).  The standard for allowing an amendment is liberal.  Rule 15 states that "leave shall be freely given when justice so requires."  *Id*.  The Eleventh Circuit Court of Appeals has stated, "Where a plaintiff seeks to amend its complaint after the defendant has answered, it may do so 'only by leave of court or by written consent of the adverse party.'  FED. R. CIV. P. 15(a).  Although '[l]eave to amend shall be freely given when justice so requires,' a motion to amend may be denied on 'numerous grounds' such as 'undue delay, undue prejudice to the defendants, and futility of the amendment.'  *Abramson v. Gonzalez*, 949 F.2d 1567, 1581 (11th Cir. 1992)."  *Brewer-Giorgio v. Producers Video, Inc.*, 216 F.3d 1281, 1284 (11th Cir. 2000).

#### 2. Analysis

The plaintiff seeks in her motion to amend to reinstate her malicious prosecution claim and, according to her motion, to reinstate the abuse of process claim.  (Doc. 17 at 2).  In support of the motion, she states that after she was convicted, she moved to dismiss both counts.  The motion to dismiss, according to the plaintiff, was granted and both claims were dismissed. Premised on the remand and reversal by the Alabama Court of Criminal Appeals, she seeks to reinstate the claims.  She also seeks to add Captain Fisher and Sanders as defendants due to Williams's deposition.  The defendant's oppose the motion to amend on two grounds.  First, they

10

assert that the reversal and remand of the plaintiff's conviction does not exonerate her of the criminal charges and, therefore, they are still precluded under *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994). Second, the deposition of Williams does not indicate the suppression of any evidence, but merely involves a decision by Captain Fisher that Sanders had acted appropriately in reporting his findings to Brewer. (Doc. 19 at ¶ 3). In her reply, the plaintiff asserts that she does not oppose the necessary application of *Heck*. (Doc. 20 at 1).

At the outset, the court notes that only Count VI previously was dismissed. To the extent that the plaintiff attempts to advance either claim related to her arrest, they are not appropriate for review at this juncture. *See Heck*, 512 U.S. at 487 n.8 ("if a state criminal defendant brings a federal civil-rights lawsuit during the pendency of his criminal trial, appeal, or state habeas corpus action, abstention may be an appropriate response to the parallel state court proceeding") (citing *Colorado River Water Cons. Dist.* v. *United States*, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)). Accordingly, the abuse of process claim is due to be dismissed without prejudice. The motion to amend to add these claims is therefore denied as to these claims.[13]

As to the plaintiff's request to add Sanders and Fisher as defendants, the court finds that the motion is due to be denied as well. She premises this part of the motion on the deposition of Williams, which, according to the plaintiff, includes "an admission . . . regarding the suppression of an investigation into wrongdoing by Officer Sanders and implicating Captain Fisher." (Doc. 17 at ¶ 5). The highlighted deposition testimony provides:

---

[13] The court also finds that this same reasoning applies to the last count (Count X in the complaint), alleging that the arrest and prosecution was in retaliation for the complaint against Jackson. It clearly implicates *Heck* and abstention issues.

. . . .

Q.      Okay.  When Ms. Adams was talking to you about Officer Sanders, and
Officer Sanders offering her and her husband a car not to report Officer Jackson
and saying things like, "You don't want a white man in your business," and again
threatening her with DHR, what was your reaction to that?

A.      Jackson or Sanders?

Q.      Sanders.

A.      That's like coercion or trying to convince her not to file a complaint.

Q.      Did y'all ever pursue that against Officer Sanders?

A.      No.  He said he reported it and told his supervisor not to even bring him up
on charges, to leave that alone.

Q.      Who told you that?

A.      From my supervisor.

Q.      Captain Fisher, Chief Coppage?

A.      I believe Captain Fisher because it was stated that he reported it and he did
tell his supervisor about the incident and what had occurred.

. . . .

A.      . . . when I looked through the IA file, Officer Sanders is never mentioned
as far as - - and Ms. Adams comments about the vehicle is never mentioned in
your report.

. . . .

Q.      Let me ask you this, though: Officer Sanders knows of what, at first blush,
appears to be a rape, appears to be an illegal activity.  He waits nearly - - either he
or Sergeant Brewer or the two of them wait nearly 24 hours to inform Internal
Affairs.  During that 24 hours, the victim said that they were offered a vehicle that
they told they don't need the white man in their business, "you are affecting a
brother, think about what you are doing," can't we at least agree that that is a red
flag and that it should at least warrant some investigation?

12

A.      Yes.

Q.      But that investigation didn't occur. . . .

. . . .

Q.      Did Officer Sanders ever reduce to writing a police report?

A.      He never did a report the night that he was called to the scene. He only went to his supervisor, Sergeant Brewer, and told him about that incident.

Q.      I'm handing you what has been marked as Plaintiff's Exhibit 2.

        (Plaintiff's Exhibit 2 was marked for identification)[14]

Q.      And what this is is an excerpt from the Birmingham Police Department Rules and Regulations.  It's subtitled Preliminary Investigations Crimes or Incidents Procedure 117-1.  It was promulgated in April of 1986 and has been effective since May of '86.

        Turn with me, if you would, to page 117-1, Page 2 of 8.  And where it says, "Note - - let me back up.  On the first page, 1 of 8, under 1, General Concept, E(7), it says, "Interrogate the suspect."  And it has an asterisk.

A.      On Page 2?

Q.      On the front page.  It has "Interrogate the suspect"and it has an asterisk. And on Page 2, the asterisk says, "Note, in major felony cases such as homicide, rape, and robbery, investigating officers should restrict their interrogation of the suspect to basic information required for the incident and arrest reports.  Suspects must be given the Miranda warning prior to any questioning."

        Officer Sanders did not give Officer Jackson a Miranda warning, did he?

A.      No, he didn't.

Q.      Go down with me to Section 2, B(4) where it says, "Uniformed patrol officer," that is what Officer Sanders was, a uniformed patrol officer.  It says, "The reporting officer - - which is Officer Sanders - - will complete the proper report on the scene - - and that is underscored - - unless further investigation is necessary at another location."

_____

[14] This exhibit is found in the record at document 27, exhibit 12.

Officer Sanders did not complete a proper report on the scene, did he?

A.     No.

Q.     Number 6 says, "Upon the completion of the investigation and report, the officer will obtain a complaint number and will be returned to service."

He did not obtain a complaint number, did he?

A.     No.

Q.     Then we talk about on Page 3 of 8, "preliminary investigation officer," which says, "It must go well beyond the simple practice of filling out the necessary space of the departmental form."  On Page 4 of 8, which is a continuation, number 3 says, "The investigating officer is required to report the incident fully and accurately."

Who was the investigation officer in Ms. Adams' case?

A.     Initially, Officer Sanders received a call.

Q.     So he would have been the preliminary investigation officer?

A.     And he spoke with Mr. Bell, who had the neighbor to call the police.

Q.     So we can agree that he did not fully and accurately report the incident?

A.     His statement is that they didn't want a report made.

Q.     But this is a crime?

A.     Well - -

(Doc. 17 at 98-112).  The defendants assert that this testimony does not show any suppression of evidence.  (Doc. 19 at ¶ 3).

Although this testimony indicates that Sanders may not have followed certain policies and procedures of the Birmingham Police Department, it does not demonstrate a claim under section 1983 or any other federal statute or state tort law.  Such improprieties are insufficient to

14

state a constitutional claim.  The fact that agency regulations or procedures have been violated does not by itself raise a constitutional issue.  *United States v. Caceres*, 440 U.S. 741, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979); *Caruth v. Pinkney*, 683 F.2d 1044 (7th Cir. 1982); *Dowdy v. Johnson*, 510 F. Supp. 836, 838 (E.D. Va. 1981).  Thus, this testimony is insufficient and the amendment is due to be denied as to Sanders and Fisher.[15]

### B. Motions for Summary Judgment

#### 1. Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Celotex*, 477 U.S. at

---

[15] Although Adams lists Sergeant Webb in the proposed amended complaint, the motion to amend (doc. 17) does not include a request to add this defendant.  Additionally, the record does not indicate a basis for permitting an amendment to add Webb at this late juncture.  Accordingly, the motion is denied as to Webb.

322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.

### 2. Analysis

The City of Birmingham, the Birmingham Police Department, Coppage, Williams, and Graham have moved for summary judgment based on the theory that (1) there are no genuine issues of fact to be considered; (2) the complaint fails to state a claim; (3) Coppage, Williams, and Graham are entitled to qualified immunity; (4) the Birmingham Police Department is a

department of the City of Birmingham, "not a separate, sueable entity;"[16] (5) the plaintiff has "failed to establish a custom, policy, or practice on the part of the City of Birmingham which caused or contributed to any violation of [the plaintiff's] constitutional rights; and, (6) the claims are time barred by the statute of limitations. (Doc. 21). Jackson has also filed a motion for summary judgment, alleging similar claims. (Doc. 24).

### a. Statute of limitations

The parties agree that the applicable statute of limitations for claims advanced under § 1983 and § 1985 is two years.[17] The first issue is when does her cause of action accrue in this instance. In determining when the plaintiff's claims accrue, the court must look to federal law. *Mullinax v. McElhenney,* 817 F.2d 711, 716 (11th Cir. 1987). The general rule is that a § 1983 claim accrues when "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Id.* (citations omitted). The plaintiff must know or have reason to know that she has been injured and who inflicted the injury. (*Id.*). "[T]he Supreme Court has clearly stated that in Section 1983 actions '[o]nly the length of the limitations period, and the closely related questions of tolling and application, are to be governed by state law.' *Wilson v. Garcia,* 471 U.S. 261, 269, 105 S. Ct. 1938, 1943, 85 L. Ed. 2d 254 (1985) (footnote omitted)." *Mullinax,* 817 F.2d at 716.

Under Alabama law, "All civil actions must be commenced after the cause of action has accrued within the period prescribed. . . ." ALA. CODE § 6-2-30(a). Additionally, the "day of the

---

[16] The plaintiff properly concedes that "Defendant Birmingham Police Department is a department of the City of Birmingham and is not a separate, sueable entity." (Doc. 26 at ¶ 5). The claims against it are due to be dismissed.

[17] Although not specifically stated by the parties, the applicable statute of limitations on the § 1985 claim is one year. 42 U.S.C. § 1986.

act . . . from which the designated period of time begins to run shall not be included." ALA. R.

CIV. P. 6(a). Jackson's actions occurred on August 9, 1998, and possibly on August 10, 1998.

Williams's interaction with the plaintiff occurred on August 10, 1998. Coppage's only direct

involvement in this matter appears to be his decision making role in placing Jackson on leave and

his August 11, 1998 inter-office correspondence to Ben Payton, the Director of the Jefferson

County Personnel Board, informing him of the decision to place Jackson on administrative leave.

(Doc. 23, Ex. 9).

Any § 1983 claim against Jackson premised on the physical assault and battery is barred

by the statute of limitations because the filing of the complaint occurred outside the two-year

period.[18] The purported claims against Williams, Coppage, and the City concerning events on

August 10, 1998, are also outside the statute of limitations. Excluding the date of the events,

August 10, 1998, the two-year statute ran on August 10, 2000. When the complaint was filed on

the next day, August 11, 2000, as noted by defense counsel, this was the first day of the third

year. Thus, these claims are one day outside the applicable period.[19]

To the extent that the plaintiff asserts that her claims are timely because of tolling

considerations, including (1) that the violations are continuing acts, (2) the representations of the

City of Birmingham mislead her (fraudulent concealment), and (3) that she was pursuing

administrative procedures, the court finds otherwise. In support of her tolling claims, she cites to

*Dumas v. Town of Mount Vernon*, 612 F.2d 974, 978 (5th Cir. 1980), *rev'd on other grounds*,

*Larkin v. Pullman Standard*, 854 F.2d 1549 (11th Cir. 1988); *City of Gadsden v. Harbin*, 398 So.

---

[18] Counsel for the plaintiff properly concedes this issue.

[19] The plaintiff's § 1986 claim is outside the statute of limitations because it was filed well beyond the one-year statute of limitations. *See* 42 U.S.C. § 1986.

19

2d 707, 709 (Ala. Civ. App. 1981); and *Rubin v. O'Koren*, 644 F.2d 1023, 1025 (5th Cir. 1981).

### i. Continuing violations

Continuing violations will toll the statute of limitations. *Dumas*, 612 F.2d at 978. In *Dumas*, the court noted, "The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights, or when he should have perceived that discrimination was occurring." *Id.*, 612 F.2d at 978.

Applying these considerations to the present facts, the court finds that the circumstances do not justify tolling the statute of limitations. The court finds that the average lay person would have been aware of the violation of her rights by Jackson on August 9 and 10, 1998. She has not demonstrated to the court's satisfaction that any other defendant violated any constitutional right during the relevant period.[20]

### ii. Fraudulent concealment

Fraudulent concealment will toll the running of the statute of limitations until the tort is discovered or could have been discovered by due diligence. *Harbin*, 398 So. 2d at 709. The plaintiff alleges that the defendants "conspired to mislead [her] by putting forth the appearance of conduct[ing] a balanced investigation. [She] had no way to know that the [d]efendants were actually making a concerted effort to destroy her case and protect [d]efendant Jackson at every step along the investigation." (Doc. 27 at 9).

The court is not convinced, even looking at the evidence in a light most favorable to the plaintiff, that the record supports a conclusion that the defendants were fraudulently concealing

---

[20] The court is pretermitting consideration of the malicious prosecution and abuse of process claims concerning the plaintiff's subsequent arrest and prosecution on drug charges in view of the application of *Heck*.

20

any conduct that resulted in a detriment to the plaintiff. Her challenges to the way the investigation proceeded are insufficient to toll the running of the statute of limitations. Specifically, her complaints regarding the way the interviews were conducted and the fact that Sanders was not a subject of inquiry or discipline, are not sufficient.[21]

### iii.  Pursuit of administrative grievances

The pursuit of an administrative grievance procedure can also toll the statute of limitations. *Rubin*, 644 F.2d at 1025. The plaintiff asserts that *Rubin* warrants the tolling of the statute in her situation. *Rubin* is distinguishable, however, in that it involved an administrative review of an employment decision by the employer. The present matter involves the plaintiff's pursuit of distinct administrative and criminal sanctions against Jackson. These pursuits were of no consequence to her right to sue for damages. The grievance procedure in *Rubin* was distinctly different from the plaintiff's pursuit of the administrative inquiry by internal affairs seeking disciplinary action against Jackson or the referral of the allegations to the district attorney for a determination of whether criminal prosecution is appropriate. These actions did not toll the running of the statute in the present case.

### b.  Municipal liability

The United States Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658, 694-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), held that "a plaintiff must prove the existence of a policy or custom that has resulted in a constitutional violation in order to make a municipality [or other governmental entity] liable under § 1983." *Groman v.*

---

[21] To the extent that Sanders's conduct was improper, it does not toll the statute of limitations in any way that is beneficial to the plaintiff on this issue.

21

*Township of Manalapan*, 47 F.3d 628, 637 (3rd Cir. 1995). "A municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* (citing *Monell*, 436 U.S. at 691). "The Court has also stated that liability for failure to train subordinate officers will lie only where a constitutional violation results from 'deliberate indifference to the constitutional rights of [the municipality's] inhabitants.'" *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).

In this case, the court finds that the plaintiff has not set forth sufficient evidence of a policy or custom to impose municipal liability. Even accepting for the sake of argument at this juncture, that Sanders, Williams, Brewer, Fisher, and Coppage may have violated certain policies or procedures of the Birmingham Police Department in handling Adams's claim against Jackson, that proof is not sufficient to impose municipal liability. In so finding, this court "recognizes that a municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference towards police misconduct." *Cannon v. Taylor*, 782 F.2d 947, 951 (11th Cir. 1986) (citing *Turpin v. Mailet*, 619 F.2d 196 (2d Cir. 1980)). However, the conduct in this matter is insufficient to establish a custom, policy, or practice on the City of Birmingham to impose liability.

The plaintiff contends that the officers in this case repeatedly showed deliberate indifference to the actions of defendant Jackson. (Doc. 27 at 11). Specifically, she asserts that the actions of the defendant officers "by failing to initiate, apply or implement then existing rules and regulations to protect citizens and discourage or prevent police misconduct" constitute deliberate indifference. (*Id.* at 11-12). Viewing the facts in the light most favorable to the

22

plaintiff, the alleged conduct of Sanders, Williams, Brewer, Fisher, and Coppage is insufficient. To the extent that the plaintiff is asserting that they conspired to prevent her complaint regarding Jackson, the evidence is insufficient to submit this matter to the jury on the issue of municipal liability.[22] By way of example, the evidence shows that immediately after Adams was interviewed, Jackson was placed on administrative leave. Although the argument is made that Sanders's failure to call a supervisor to the scene and to report the incident in writing and with more detail warranted investigation and discipline, this is insufficient to warrant municipal liability in this case. There is no question that Sanders made a report of the allegation to Brewer. At worst, he initially failed to detail all the details that were known to him. Again, this is not sufficient to impose municipal liability in this case.[23] Sanders's conduct after Jackson's encounter with Adams, where he discussed providing them (Adams and Bell), with a car is outside the statute of limitations and, although troubling, is not the kind of evidence that warrants application of municipal liability.

### c. Qualified immunity

The individual defendants next assert that they are entitled to qualified immunity. The plaintiff counters that "any officer should know that a rape by a police officer and the subsequent police cover up is violative of a citizen's rights and would be apparent to any objective observer." (Doc. 27 at 11). "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)." *Hope v. Pelzer,*

---

[22] It is also insufficient to overcome the defendants motion for summary judgment on her §1985 conspiracy claims.

[23] For the reasons stated in this discussion section, the court also finds that the plaintiff's claim pursuant to 42 U.S.C. § 1986 would be due to be dismissed even if it was not barred by the applicable statute of limitations.

___ U.S. ___, 122 S. Ct. 2508, 2513 (2002).

In this matter, the court has already determined that there are insufficient facts to demonstrate a cognizable constitutional claim that is ripe for review by this court within the statute of limitations as to the defendants. Even assuming that a constitutional claim were cognizable concerning the investigation of this matter, the defendants are entitled to qualified immunity "if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)." *Hope*, 122 S. Ct. at 2515. In *Hope*, the Supreme Court reiterated:

> As we have explained, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. at 206, 121 S. Ct. 2151. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [v. *Forsyth*, 472 U.S. 511,] 535 n.12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).
>
> Officers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with the criminal offense defined in 18 U.S.C. § 242. Section 242 makes it a crime for a state official to act "willfully" and under color of law to deprive a person of rights protected by the Constitution. In *United States v. Lanier*, 520 U.S. 259, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997), we held that the defendant was entitled to "fair warning" that his conduct deprived his victim of a constitutional right, and that the standard for determining the adequacy of that warning was the same as the standard for determining whether a constitutional right was "clearly established" in civil litigation under § 1983.

*Hope*, 122 S. Ct. at 2515.

In this case, the defendants did not receive "fair warning" that their actions in conducting

the investigation were such that would expose them to an action for civil damages.[24]  The plaintiff has not cited any authority that would have put the defendants on notice  Additionally, the officers' conduct was not of such a nature as to allow this court to conclude that they necessarily should have known that such actions were improper to the extent of exposing them to liability.  Defendants Coppage and Williams are entitled to qualified immunity.[25]

### d. Battery

Actions for trespass to the person against an individual, such as a battery, must be commenced within six years.  ALA. CODE § 6-2-34(l).[26]  The elements of battery are (1) that the defendant touched the plaintiff, (2) that the defendant intended to touch the plaintiff, and (3) that the touching was conducted in a harmful or offensive manner.  *Wood v. Cowart Enterprises, Inc.*, 809 So. 2d 835, 836 (Ala. Civ. App. 2001).  The statute of limitations for this action against Jackson is six years.  ALA. CODE § 6-2-34(1).

The plaintiff contends that Jackson battered her when she and Jackson entered the house, after her husband (Bell) had left the residence.  Jackson asserts that the contact was with Adams's consent.  Premised on the record and the facts, and reviewing the evidence in the light

---

[24] For the reasons previously stated, this reasoning is not applicable to the claims concerning the subsequent arrest and prosecution of the plaintiff.  Additionally, the court is not referring to the conduct of Jackson at this juncture because the § 1983 claims are time barred.

[25] Had the court permitted the amendment to add Fisher and Sanders, they would also be entitled to qualified immunity.  To the extent that Graham claims that he is entitled to qualified immunity, the court finds that portion of the motion is moot in light of the court's decision to dismiss this action without prejudice.  Graham may raise this claim later if this action is ever refiled as to him.

[26] Jackson incorrectly asserts that the applicable statute of limitations is two years.  In citing to *Mardis v Robbins Tire & Rubber Co.*, 669 So. 2d 885 (Ala. 1995), Jackson fails to recognize that in that case, the summary judgment that was granted on grounds of the two-year statute of limitations concerned the employer and not the employee (the defendant that actually committed the battery).  The claims against the individual were still pending in the lower court during the appeal by the plaintiff in that case.  *Id.*, 669 So. 2d at 887.  To the extent that the battery claim is made against the City of Birmingham or any other defendant under a vicarious liability theory, it would be time barred by the two-year statute of limitations.  *See* ALA. CODE § 6-2-38(l) & (n).

most favorable to the nonmovant, a reasonable jury could find that Jackson committed a battery on the plaintiff even though the coercion was not physical. This claim is not barred by the applicable statute of limitations and there is a dispute of material fact. Accordingly, summary judgment is due to be denied.

### e. Negligence

The plaintiff alleges in the eighth count that the defendant officers were negligent. The defendants assert that this claim is due to be dismissed due to the fact that it is untimely as to any defendant except Graham and as to him it is due to be dismissed as the claim is not ripe. The plaintiff does not specifically address the defendants' assertions in her brief and does not offer any specific evidence to rebut the defendants' claims. Thus, the court deems that the plaintiff has abandoned this claim. *See Smith v. International Paper Co.*, 160 F. Supp. 2d 1335, 1347 (M.D. Ala. 2001) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995)). The defendants' motions for summary judgment as to this claim is due to be granted and it is due to be dismissed. For the sake of completeness, however, the court will address the merits of the same.

The court finds that any negligence claims that predate August 11, 1998, are time barred due to the two-year negligence statute of limitations. *See Bush v. Ford Life Ins. Co.*, 682 So. 2d 46, 47 (Ala. 1996).

A claim of negligence is sufficient to avoid summary judgment when evidence is submitted illustrating a duty, a breach of that duty, causation, and damage to the plaintiff. *AALAR, Ltd., Inc. v. Francis*, 716 So. 2d 1141 (Ala. 1998). Reviewing the record, the court does not find that within the limitations period any defendant violated any duty owed the plaintiff that

26

resulted in sustained damages.[27] For instance, to the extent that the officers did not follow

specific Birmingham Police Department policies and procedures or were dilatory in acting, there

were no damages articulated by the plaintiff.[28]

### f. Supplemental jurisdiction

In view of the fact that the only remaining claim is the assault and battery against

Jackson, the court must next consider whether it should exercise supplemental jurisdiction over

the claim under § 1367(a)[29] or whether it should decline to exercise such jurisdiction under §

1367(c).[30]

---

[27] For completeness, the court again notes that this finding is limited to the claims and conduct properly reviewable by this court at this juncture. The court is not dealing with Graham's actions surrounding the arrest for the reasons previously stated.

[28] The court would once again note that most of the conduct that would involve some alleged breach of a duty (e.g. Sanders actions) were outside the statute of limitations.

[29] 28 U.S.C. § 1367(a) provides as follows:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).

[30] Section 1367(c) provides:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

27

In *Palmer v. Hosp. Auth. of Randolph Co.*, 22 F.3d 1559, 1569 (11ᵗʰ Cir. 1994), the Court of Appeals reiterated that whenever a federal court has supplemental jurisdiction under section 1367(a) that jurisdiction should be exercised unless section 1367(b) or (c) applies. When subsection (c) permits a court to decline to exercise its jurisdiction, the court's discretion should be guided by the factors described in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-27, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966): judicial economy, convenience, fairness to the parties, and comity. *Palmer*, 22 F.3d at 1569. Typically, where federal claims are dismissed before trial, these factors will favor dismissal of the state claims. *See e.g., Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988); *United Mine Workers*, 383 U.S. at 726; *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352-53 (11ᵗʰ Cir. 1997).

In *Gibbs*, "the Supreme Court reiterated that 'when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.' *Id.* at 350, 108 S. Ct. at 619 (footnote omitted)." *Eubanks v. Gerwen*, 40 F.3d 1157, 1161-62 (11ᵗʰ Cir. 1994).

Applying the *Gibbs* considerations in the present case, it is apparent that the court should decline to exercise its discretion to hear the remaining claim. Resolution of the plaintiff's state law claim against Jackson depends solely on a determination of state law. Accordingly, the state court, and not this court, should be the arbiter of state law. *Baggett*, 117 F.3d at 1353. There no longer is any pressing federal issue in this litigation. The period of limitations for the remaining claim has been tolled and will be tolled so as to permit the plaintiff to refile her claim in state court should she decide to do so. 28 U.S.C. § 1367(d). She will suffer no prejudice. None of the considerations – judicial economy, convenience, fairness to the parties, or comity – warrant

28

continuation of this action in this court. Accordingly, this claim is due to be dismissed without prejudice to the plaintiff's right to refile that claim in state court. In so finding, this court recognizes that there is a possibility that the claims against Graham that are hereby dismissed may be refiled at some later juncture. That possibility, however, is not sufficient for this court to retain jurisdiction. The plaintiff and Jackson are entitled to more expeditious disposition of the remaining claim should the plaintiff decide to proceed on that claim.

**IV. CONCLUSION**

For the foregoing reasons, the plaintiff's motion to amend the complaint is due to be denied and the defendants' motions for summary judgment are due to be granted in part and denied in part. More particularly with regard to the motion for summary judgment filed by the municipal defendants, the court finds that the plaintiff's claims against the City of Birmingham, the Birmingham Police Department, Coppage, and Williams are due to be dismissed with prejudice. The claims against Graham are due to be dismissed without prejudice due to the inclusion therein of allegations of an illegal arrest, abuse of process, and malicious prosecution. The abuse of process claim against Graham is also due to be dismissed without prejudice premised on the motion of the plaintiff. The motion for summary judgment on behalf of Graham is moot to the extent it seeks a dismissal of the claims against him on qualified immunity grounds. The motion for summary judgment filed by Jackson is denied to the extent that it seeks a judgment on the battery claim. It is due to be granted as to the remaining claims against him. This court, however, declines to exercise supplemental jurisdiction over the remaining claim. An order in accordance with the court's findings will be entered contemporaneously herewith.

**DONE**, this *31ST* day of July, 2002.

_____

**JOHN E. OTT**
United States Magistrate Judge